**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **CONNIE B.[1],** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 7:22-cv-00260** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

### <u>MEMORANDUM OPINION</u>

Plaintiff Connie B. ("Connie") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381-1383f. Connie alleges that the ALJ did not properly analyze her mental impairments, physical impairments, or her subjective allegations about her conditions. I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **GRANT** the Commissioner's Motion for Summary Judgment (Dkt. 19) and **DENY** Connie's Motion for Summary Judgment (Dkt. 15).

### <u>STANDARD OF REVIEW</u>

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Connie failed to demonstrate that she was disabled

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Connie filed for SSI in December 2018, claiming her disability began on November 1, 2018, due to depression and anxiety, bipolar disorder, diabetes mellitus with reduced vision, obesity, fibromyalgia, diarrhea with frequent accidents, palpitations, dizziness and feeling lightheaded, pain in her lower extremities, severe fatigue, difficulty concentrating and focusing, pain in her right hand, and difficulty using her right hand. R. 115, 134. The state agency denied

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Connie's applications at the initial and reconsideration levels of administrative review. R. 114–130, 133–150. On July 8, 2021, ALJ Michael Dennard held a hearing to consider Connie's claims for SSI. R. 44–75. Counsel represented Connie at the hearing, which included testimony from vocational expert William Houston Reed. On September 13, 2021, the ALJ entered his decision analyzing Connie's claims under the familiar five-step process[3] and denying her claims for benefits.[4] R. 16–37.

The ALJ found that Connie suffered from the severe impairments of diabetes, obesity, sacroiliac arthropathy, fibromyalgia, visual disturbances, depression, and anxiety. R. 18. The ALJ found that Connie was mildly limited in the broad functional areas of understanding, remembering, or applying information and adapting or managing oneself and moderately limited in the broad functional areas of interacting with others and concentrating, persisting, or maintaining pace. R. 24–26.

The ALJ determined that Connie's mental and physical impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 21. The ALJ specifically considered section 9 (endocrine disorders), listing 1.18 (abnormality of a major joint), SSR 12-2p[5] (fibromyalgia), SSR 19-2p (obesity), listing 2.02 (impairment of visual

---

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[4] Connie was 44 years old on her alleged onset date, making her a younger person under the Act. R. 26.

[5] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20

acuity), listing 12.04 (depressive, bipolar, and related disorders), and listing 12.06 (anxiety and obsessive-compulsive disorders).

The ALJ concluded that Connie retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 26. Connie can occasionally stoop, kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes, or scaffolds. Id. She is able to avoid ordinary hazards in the workplace and can occasionally work at unprotected heights, around hazardous machinery, in humidity, and in wetness, extreme cold, or vibration. Id. Connie can perform simple, routine tasks with simple, short instructions and simple work-related decisions in a work environment with only occasional workplace changes and no supervisory duties. Id. She cannot perform tasks in which others rely on her timely performance of work. Id. Connie can have occasional, superficial interaction [6] with coworkers and the public and can have occasional interaction with supervisors. Id. The ALJ determined that Connie did not have any past relevant work but could perform jobs that exist in significant numbers in the national economy, such as marker, mail clerk, and router. R. 35–36. Thus, the ALJ determined that Connie was not disabled. R. 37. Connie appealed the ALJ's decision, and the Appeals Council denied her request for review on April 13, 2022. R. 1–4.

## ANALYSIS

Connie alleges that the ALJ did not properly analyze her mental impairments, physical impairments, or her subjective allegations about her conditions.

---

C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

[6] The ALJ defined superficial to include "such things as telling the time of day or providing directions to the bathroom." R. 26.

### A. Medical History Overview

1. <u>Medical Treatment</u>

Connie has a diagnosis of type-2 diabetes that predates her alleged onset date. R. 429. Connie was prescribed medication to help control her diabetes. R. 607. Connie's blood sugar sometimes reaches into the 400s. R. 567, 670. Connie had no treatment for her diabetes from January 2020 through January 2021 and reported not taking her diabetes medication for an unspecified period. R. 670. Connie reported that her diabetes caused fatigue, retinopathy, numbness in her hands and feet, and pain. R. 567, 659. Connie also has diagnoses of obesity and fibromyalgia that predate her alleged onset date. R. 478, 505. Connie typically presented with no assistive ambulatory devices and had a normal gait. R. 572–73, 664.

During the relevant period, Connie had her visual acuity tested. In June 2019, her visual acuity was 20/100 in her left eye and 20/29 in her right eye. R. 570. In September 2020, her visual acuity was 20/200 in her left eye and 20/40 in her right eye. R. 660. Both assessments were completed without Connie wearing corrective lenses. R. 570, 660. Connie stated during her hearing before the ALJ that her vision gets blurry when her blood sugar is above 400. R. 55.

Connie also has a history of several mental health diagnoses, including mood disorder, panic attacks, and major depressive disorder R. 497, 512, 607, 671. Connie solely saw her primary care provider for management of her mental health diagnoses, and her primary care provider prescribed medication to help manage the diagnoses. R. 497, 607. In the instances Connie saw her primary care provider during the relevant period, her mood was sometimes found to be anxious and depressed, but her memory, affect, behavior, thought content, and judgment were normal. R. 603, 609, 670. Connie had no treatment for her mental health from

January 2020 through January 2021 and reported not taking her medication for an unspecified period. R. 670.

 2.  Medical Opinions

Connie was previously denied disability benefits in October 2018, where she was found to be able to complete light work with a limitation to simple, routine tasks. R. 79–108. The ALJ gave some weight to the decision but noted that the previous opinion dealt with a date last insured of December 31, 2013. R. 32. The ALJ explained that "[t]here have been some changes in [Connie's] physical and mental conditions . . . since that time and account for the differences between the residual functional capacity in the prior decision and the current residual functional capacity." Id.

In June 2019 and October 2020, respectively, state agency physicians Gene Godwin, M.D., and Manish Gambir, M.D., reviewed the record and found that Connie could occasionally lift and carry 20 pounds and could frequently lift and carry 10 pounds. R. 124, 144. Drs. Godwin and Gambhir also concluded that Connie could occasionally climb ramps, stairs, ladders, ropes, scaffolds, balance, stoop, kneel, crouch, or crawl. R. 125, 145. Drs. Godwin and Gambhir found that Connie could stand, walk, or sit for six out of eight hours of the workday. R. 124, 144. The ALJ found these opinions persuasive. R. 34.

In June 2019 and October 2020, respectively, state agency psychiatrists Daniel Walter, Psy.D., and Leslie Montgomery, Ph.D., reviewed the record and found that Connie had moderate limitations in interacting with others and in concentration, persistence, or pace, and mild limitations in understanding, remembering, or applying information and adapting or managing oneself. R. 122, 142. Drs. Walter and Montgomery also concluded that Connie had moderate limitations in her ability to carry out detailed instructions and to interact with the public and

coworkers. R. 126–27, 147. The ALJ found these opinions persuasive. R. 34. The ALJ reasoned

that Connie "had solely routine and conservative treatment for her mental and physical

impairments, which consisted of medications prescribed by her primary care provider." R. 33.

In June 2019, Marvin Gardner, Ph.D., performed a psychological consultative

examination. R. 576–581. Dr. Gardner concluded that Connie "is able to perform simple and

repetitive work tasks and to maintain regular attendance in the workplace." R. 581. Dr. Gardner

also found that Connie could perform work activities on a consistent basis and accept

instructions from supervisors. Id. Dr. Gardener concluded that Connie "is not able to complete a

normal workday or work week without interruptions resulting from her psychiatric condition"

and "would likely have marked difficulty in relating consistently to coworkers and with the

public" due to her anger and combativeness. Id. Dr. Gardner also found that Connie had fair

insight and fair to poor overall judgment. R. 580. The ALJ found this opinion not persuasive.

R. 34. The ALJ reasoned that Dr. Gardner's opinion "is not supported by his objective

examination findings, and appears to be primarily based on the claimant's subjective report of

symptoms." Id. The ALJ concluded that the restrictions articulated in the RFC accommodate

Connie's limitations consistent with the objective findings in the record. Id.

Also in June 2019, Heidi Rogers, D.O., performed a physical consultative examination.

R. 566–74. Dr. Rogers concluded that Connie could carry 20 pounds frequently and 40 pounds

occasionally. R. 574. Dr. Rogers also found that Connie could sit, stand, and walk normally in an

8-hour workday with normal breaks. Id. Dr. Rogers noted that Connie did not use an assistive

device to ambulate but that she had 16 out of 18 positive trigger points on her examination and

that "[t]here are visual limitations due to decreased left visual acuity." R. 572–74. The ALJ

found Dr. Rogers's opinion persuasive. R. 35. The ALJ reasoned that Dr. Rogers's opinion "is

supported by [Connie's] normal objective examination findings[.]" Id. However, the ALJ gave some weight to Connie's subjective allegations and "limited her to light exertion work and afforded some additional non-exertional residual functional capacity limitations." Id.

In September 2020, Peter Bolaji, M.D., performed a physical consultative examination. R. 658–66. Dr. Bolaji concluded that Connie could carry 15 pounds frequently and 25 pounds occasionally. R. 665. Dr. Bolaji also found that Connie could sit, stand, and walk normally in an 8-hour workday with normal breaks. Id. Dr. Bolaji concluded that Connie should be limited to occasional bending, stooping, crouching, and squatting due to joint pain and that "[t]here are relevant visual limitations due to decreased left visual acuity." Id. The ALJ found Dr. Bolaji's opinion persuasive and slightly more persuasive than the opinion of Dr. Rogers. R. 35. The ALJ reasoned that Dr. Bolaji's opinion is consistent with the record, "which showed minimal treatment for [Connie]'s physical complaints throughout the period of review and largely normal objective examination findings." Id. However, the ALJ also provided further limitations based on Connie's testimony, fibromyalgia, and vision issues. Id.

### B. Mental Impairments under SSR 96-8P

Connie argues that the ALJ failed to properly assess her mental impairments as required by SSR 96-8P. See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Specifically, Connie asserts that the ALJ failed to explain how his RFC findings account for Connie's moderate limitations in concentration, persistence, or pace and in interacting with others. Pl.'s Br. at 16, Dkt. 16. Connie further argues that the ALJ "erroneously concluded Dr. Gardner's examination findings and the evidence of record are inconsistent with his opinions." Id. at 17. Connie also argues that the ALJ did not address her ability to sustain work. Id. at 16.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011).  The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe, 826 F.3d at 189 (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In Shinaberry v. Saul, the Fourth Circuit clarifies that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). However, Mascio does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Id. In contrast, Shinaberry highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). Shinaberry further confirms that Mascio does not

broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC, but instead underscores the ALJ's duty to adequately review the evidence and explain the decision. See also Monroe, 826 F.3d 176 (emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

Here, the ALJ explained why Connie's moderate limitations in concentration, persistence, or pace and in interacting with others did not translate into a limitation in the RFC beyond that imposed. As it relates to concentration, persistence, or pace, the ALJ specifically acknowledged that Connie testified that she had difficulty concentrating and finishing what she started and reported needing to rewind TV shows due to missing plot points. R. 25. The ALJ also acknowledged that Connie "had a variable mood during the period of review[.]" Id. However, the ALJ noted that Connie "generally did not complain to treating or examining practitioners of serious difficulty maintaining concentration, persistence, or pace" and that treating and examining practitioners "did not observe that [Connie] was overly distractible or slow." R. 24. The ALJ also noted that Connie "reported doing a variety of daily tasks that require some concentration, persistence, and pace[,]" such as letting her dog out, preparing meals and performing light household chores, getting the mail, driving in a car alone, paying bills, and taking her medications. R. 25. Contrary to Connie's argument, the ALJ explained his reasoning and the RFC, including specific references to the medical records and opinions. The ALJ explained that Connie's moderate limitations in concentration, persistence, or pace were accommodated with a restriction to simple, routine tasks and simple, short instructions and a restriction from performing tasks in which others rely on her timely performance. Id.

As it relates to interacting with others, the ALJ specifically acknowledged that Connie had problems getting along with certain family members, did not go in public "because she thought everyone around her was judging her[,]" had variable ability to interact with authority figures, and that Connie reportedly "snapped" at a supervisor while working at a former job. R. 24. The ALJ acknowledged that Connie had a history of conflict while working and a variable mood. Id. However, the ALJ noted that Connie generally interacted normally with practitioners and did not "have serious deficiencies in eye contact, speech, or conversation." Id. The ALJ also noted that Connie reported no "serious problems with interpersonal interaction to practitioners" and that her practitioners "regularly noted that she was cooperative, friendly, and in no distress." Id. Contrary to Connie's argument, the ALJ explained his reasoning and the RFC, including specific references to the medical records and opinions. The ALJ explained that Connie's moderate limitation in interacting with others was accommodated with a restriction to occasional, superficial interaction with coworkers and occasional interaction with supervisors.[7] Id. The ALJ also concluded that Connie could have no supervisory duties.[8] Id.

Connie's assertion that the ALJ did not explain how the RFC findings address or accommodate her moderate limitations with concentration, persistence, or pace and with

---

[7] Connie asserts that the ALJ "does not ever actually explain how these findings support his conclusion that [Connie's] moderate limitations in interacting with others result in a restriction to occasional, superficial interaction with coworkers and the public and occasional interaction with supervisors." Pl.'s Br. at 20, Dkt. 16. I disagree. As discussed, the ALJ explained that Connie alleged difficulties in interacting with others, but these difficulties were not seen by practitioners. Practitioners repeatedly found that Connie was friendly and cooperative. R. 24. As such, the ALJ provided the discussion necessary to connect his conclusion and the evidence supporting the RFC determination.

[8] Connie argues that the ALJ failed to address her ability to sustain work over an eight-hour day. Pl.'s Br. at 16, Dkt. 16. The purpose of the RFC is to assess "an individual's ability to do sustained work-related physical and metal activities in a work setting on a regular and continuing basis" meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." See 20 C.F.R. §§ 404.1545(b); SSR 96-8, 1996 WL 374184, at *1-2. Here, the ALJ determined that Connie could perform sustained work activities in an ordinary work setting on a regular and continuing basis with certain limitations and accommodations. The ALJ provided a narrative discussion explaining his conclusions and the evidence supporting the RFC determination.

interacting with others is unfounded. The ALJ provided a lengthy narrative discussion of Connie's allegations, treatment records, and opinion evidence regarding her mental health limitations.[9] The ALJ considered Connie's allegations of difficulty being around people and with concentration, persistence, and pace at length in his opinion. The ALJ explained how his RFC is supported by Connie's mental health treatment records and carefully analyzed each facet of her mental health impairments. Accordingly, I find that the ALJ's assessment of Connie's impairments was sufficient under SSR 96-8P.

Connie also argues that the ALJ erred in his consideration of Dr. Gardner's opinion and should not have rejected Dr. Gardner's conclusion about Connie's ability to work. Specifically, Connie argues that the ALJ erroneously concluded that Dr. Gardner's opinion is not persuasive or supported by his objective findings. Pl.'s Br. at 17, Dkt. 16. The Commissioner counters that the ALJ properly evaluated Dr. Gardner's opinion evidence. Def.'s Br. at 16, Dkt. 20.

Connie submitted her application in December 2018, thus, 20 C.F.R. §§ 404.1520c governs how the ALJ considered the medical opinions here.[10] When making an RFC assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide, however, that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how

---

[9] Connie states that "a proper assessment of [her] RFC requires a more in-depth discussion of [her] mental impairments at Step 4 than at Step 2 or 3. Pl.'s Br. at 18, Dkt. 16. However, as noted above, the ALJ provided an in-depth discussion of Connie's allegations, treatment records, and opinion evidence. Connie's argument is without merit.

[10] 20 C.F.R. §§ 401.1520c, 416.920c applies to claims filed on or after March 27, 2017. For claims filed before this date, the rules in § 404.1527 apply.

he considered these two factors in his decision. Id. "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization, and other factors such as an understanding of the disability program's policies and evidentiary requirements. Id.[11]

Here, the ALJ properly considered Dr. Gardner's opinions under the new regulations. The ALJ discussed Dr. Gardner's opinions and provided specific reasons why he found them not to be persuasive. Regarding Dr. Gardner's opinion that Connie could not complete a normal workday or work week without interruptions resulting from her psychiatric condition, frequently became angry and combative and was charged with multiple felonies, had marked difficulty in relating to coworkers and the public, and could not deal with the usual stressors encountered in competitive work, the ALJ noted that these opinions were not persuasive. R. 34. The ALJ noted that during the single consultative examination with Dr. Gardner, Connie was appropriately dressed and groomed, made good eye contact, had a cooperative and friendly attitude, and had responsive speech and spoke at a normal rate and tone. Id. The ALJ also noted that while Connie had limitations in immediate recall, recent memory, and general fund of information, she

---

[11] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well–supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3).

completed serial 3s and 7s without error and had fair insight. Id. The ALJ concluded that these objective findings from Dr. Gardner "do not support marked limitations in interaction or an inability to deal with the usual stresses encountered in competitive work" but were instead "primarily based on [Connie's] subjective reports of symptoms." Id. As Dr. Gardner noted in his evaluation, "all information in this report was provided by [Connie] unless otherwise noted." R. 577.

The ALJ reasoned that Dr. Gardner's opinions were not consistent the record, "which showed entirely normal mental status examination findings with the exception of an occasionally depressed or anxious mood" and no specialized mental health treatment. Id. While the record reflects that Connie has a history of several mental health diagnoses, including mood disorder, panic attacks, and major depressive disorder, the record also reflects that Connie only ever saw her primary care provider for management of these diagnoses. R. 497, 512, 607, 671. During the relevant period when Connie saw her primary care provider, her memory, affect, behavior, thought content, and judgment were normal. R. 603, 609, 670. Furthermore, Connie's mental health went untreated from January 2020 through January 2021, during which time she stopped taking her medication for an unspecified period. R. 670. However, the ALJ acknowledged that Connie has a moderate limitation in interacting with others and "afforded significant restrictions regarding interaction in the residual functional capacity." R. 34. The ALJ also considered Drs. Walter's and Montgomery's recommendations that Connie had moderate limitations in the ability to work and interact with coworkers, interact with the public, and accept instructions from supervisors. R. 33. Drs. Walter and Montgomery recommended brief interactions with the public and limited interactions with supervisors and coworkers. Id. The ALJ found these opinions persuasive and added the more limited restriction that Connie could only have superficial

14

interaction with coworkers and the public, "with superficial defined as she can do such things as telling the time of day or providing directions to the bathroom." R. 26. Thus, the ALJ appropriately considered Dr. Gardner's opinions and provided a sufficient explanation for his determination that the opinions were not fully supported by and consistent with Connie's treatment records.

The ALJ adequately explained why he found the opinions not persuasive, and I will not reweigh the evidence. The RFC assessment lies squarely with the ALJ, not with any medical provider or examiner. 20 C.F.R. §§ 404.1546(c), 416.946(c); see Felton-Miller v. Astrue, 459 F. App'x 226, 230-231 (4th Cir. 2011) ("The ALJ was not required to obtain an expert medical opinion as to [the] RFC."). To this end, when conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the Court defers to the ALJ's decision. Shinaberry v. Saul, 952 F.3d 113, 123 (4th Cir. 2020).

### C.  Function-by-Function Analysis

Connie argues that the ALJ "failed to properly consider [Connie's] decreased left visual acuity and the additional blurred vision that occurs with elevated blood sugar levels above 400[.]" Pl.'s Br. at 22, Dkt. 16. Connie further argues that the ALJ "failed to explain how he could find the opinions of Dr. Rogers and Dr. Bolaji to be persuasive but not include any additional visual restrictions in his RFC findings." Id. The Commissioner counters that the ALJ performed a proper function-by-function analysis and that Connie "did not present evidence substantiating a greater degree of visual limitation." Def.'s Bri. At 18, Dkt. 20.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions

reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR96-8p and contains sufficient information to allow meaningful review. Unlike in Mascio, the court is "not left to guess about how the ALJ arrived at his conclusion" because the ALJ's findings include a comprehensive analysis of Connie's medical records, the medical opinions, and the ALJ's

conclusion. The ALJ explains how the limitations in the RFC correlate with Connie's severe impairments. Specifically acknowledging Connie's visual acuity, the ALJ noted that "due to [Connie's] decreased vision in her left eye, she can have occasional exposure to unprotected heights and hazards, but she is able to avoid ordinary hazards in the workplace, such as a box on the floor, or a door ajar." R. 31. Further, the ALJ noted that Connie's medical records show that with correction, she had 20/20 vision.[12] Id.

The ALJ also considered the opinions of Drs. Rogers and Bolaji, who both concluded that "[t]here are visual limitations due to decreased left visual acuity" but did not suggest any specific limitations. R. 574, 665. The ALJ acknowledged that Connie's visual acuity in her left eye in June 2019 and September 2020, respectively, was 20/100 and 20/200. R. 29. However, these examinations were conducted without corrective lenses, and the ALJ noted that "[i]t is unclear why she did not use her corrective lenses at her consultative examinations." Id. The ALJ found the opinions of Drs. Rogers and Bolaji to be persuasive and limited Connie to occasional exposure to unprotected heights and hazards, which are both restrictions that the ALJ placed on Connie "due to her decreased vision in her left eye" and "vision issues[.]" R. 31, 35. Contrary to Connie's argument, the ALJ did include visual restrictions in his RFC in accordance with the opinions of Drs. Rogers and Bolaji. Furthermore, the ALJ considered the conclusions of the state agency physicians, who both concluded that Connie did not have any visual limitations. R. 125, 145.

---

[12] Connie argues that "[t]he ALJ did not clarify or acknowledge that the medical evidence he referred to regarding [Connie's] corrected vision was from March of 2018 and her vision had changed by the time of the ALJ's decision[.]" Pl.'s Br. at 22, Dkt. 16. Connie is incorrect. The ALJ specifically states, "With regard to her vision, at her eye appointment in March 2018, her vision was 20/20 bilaterally when corrected." R. 29. Clearly, the ALJ acknowledged that the evidence he referred to was from March 2018. Further, the ALJ could not reasonably conclude that Connie's vision had changed since March 2018 because the 20/20 vision was with corrective lenses and the two subsequent visual acuity measurements were conducted without corrective lenses. R. 572, 664.

At her hearing, Connie stated that her vision gets blurry when her sugar gets over 400, which happens two to three times per week. R. 55–56. Connie argues that the ALJ failed to consider this evidence. Pl.'s Br. at 21–22, Dkt. 16. An ALJ "is not required to discuss all evidence in the record. . . . Indeed, to require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's alleged conditions would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." Jeremy A.C. v. Kijakazi, No. 3:21-cv-00007, 2022 WL 3146317, at *8 (E.D. Va. June 3, 2022). A claimant must show that the ALJ used an improper legal standard, did not consider a relevant portion of the record, did not satisfy the duty of explanation, or the overwhelming weight of inconsistent evidence overcomes the very low substantial evidence standard. The Fourth Circuit has been clear that an ALJ's findings "as to any fact, if supported by substantial evidence, shall be conclusive." Hart v. Colvin, No. 5:169cv32, 2016 WL 8943299, at *3 (N.D.W. Va. Sept. 14, 2016) (quoting Walls v. Barnhart, 296 F. 3d 287, 290 (4th Cir. 2002)). Here, Connie does little more than argue that the ALJ should have given more weight to her vision issues. Connie mentioned for the first time during the hearing that her vision gets blurry when her blood sugar is over 400. The records of her primary care provider and consultative physicians do not mention any complaints of blurriness when her blood sugar hits a certain level and do not show that Connie sought treatment for this blurriness issue. Without more, Connie has not shown that the ALJ ignored or misrepresented the medical record.[13]

---

[13] Connie argues that the ALJ failed to address her ability to sustain work over an eight-hour day. Pl.'s Br. at 22, Dkt. 16. The purpose of the RFC is to assess "an individual's ability to do sustained work-related physical and metal activities in a work setting on a regular and continuing basis" meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." See 20 C.F.R. §§ 404.1545(b); SSR 96-8, 1996 WL 374184, at *1-2. Here, the ALJ determined that Connie could perform sustained work activities in an ordinary work setting on a regular and continuing basis with certain limitations and accommodations. The ALJ provided a narrative discussion explaining his conclusions and the evidence supporting the RFC determination.

Contrary to Connie's contentions, the ALJ provided a detailed summary of Connie's physical impairments, medical records, testimony, and opinion evidence. The ALJ was required to create a narrative discussion that builds "an accurate and logical bridge from the evidence to his conclusion," which the ALJ did in his discussion of the medical and non-medical evidence, Connie's alleged symptoms, and the medical opinions of record. This narrative discussion allows this court to see how the evidence in the record—both medical and non-medical—supports the RFC determination. Because I was not "left to guess" at how the ALJ reached his RFC determination, I find that the ALJ's conclusion is supported by substantial evidence. Mascio, 780 F.3d at 637.

### D. Subjective Allegations

Connie argues that the ALJ's assessment of her allegations is not supported by substantial evidence. Connie claims that the ALJ "improperly discounted [Connie's] subjective complaints of pain and fatigue based largely on the lack of objective medical evidence substantiating her statements." Pl.'s Br. at 22, Dkt. 16. Connie further argues that the ALJ did not consider her allegations, failed to reference her statements and activities of daily living, and failed to consider the opinion evidence of Drs. Gardner, Rogers, and Bolaji. Id. at 24. Connie states that the "crux of [her] case centers around whether [her] impairments prevent her from meeting the standing, walking, lifting, carrying, reaching, and other physical demands of her past relevant work and the light RFC found by the ALJ." Id.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).

First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[14] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

Here, the ALJ found that Connie's medically determinable impairments could reasonably be expected to cause the symptoms alleged. R. 31. However, the ALJ found that Connie's statements concerning the intensity, persistence, and limiting effect of those symptoms were not consistent with the record. Id. Connie argues that the ALJ failed to evaluate the intensity and persistence of her pain. Pl.'s Br. at 23, Dkt. 16. However, the ALJ considered the whole record as required under the regulations. The ALJ acknowledged that "[d]uring two physical consultative examinations, she had slightly limited range of motion and at least 8/18 trigger points regarding fibromyalgia" and that "[y]ears prior to her alleged onset date, imaging showed sacroiliac arthropathy." R. 31. The ALJ discussed a function report Connie completed, which outlined fibromyalgia pain, which made it difficult for her to put on her bra and to shower. R. 27. The ALJ also discussed Connie's hearing testimony, where she testified that her feet hurt and

---

[14] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

that she had pain in her hips that would hurt with extended sitting. R. 28. However, the ALJ noted that Connie "routinely had entirely normal physical examination findings with treating providers, with no notes of any objective examination abnormalities regarding her gait, strength, sensation, and range of motion." R. 31. The ALJ also noted that Connie "only had conservative treatment consisting of intermittent primary care visits with prescribed medications." Id. The ALJ also specifically considered Connie's activities of daily living, which the ALJ may properly rely on in rejecting a claim of disability. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005). Connie's activities of daily living included preparing simple meals and performing light household chores, going outside daily to get the mail, driving and riding in the car, and shopping for groceries and household items once per week.[15] R. 27.

Connie argues that the ALJ "improperly discounted [her] subjective complaints of pain and fatigue based largely on the lack of objective medical evidence substantiating her statements." [16] Pl.'s Br. at 22, Dkt. 16. However, an ALJ may consider objective medical evidence in evaluating the intensity and severity of alleged pain. "Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers[.]" Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996) (citing 20 C.F.R. §§ 416.929(c)(4), 404.1529(c)(4). Here, the ALJ correctly considered the objective

---

[15] Connie argues that the ALJ failed to reference Connie's activities of daily living. Pl.'s Br. at 24, Dkt. 16. This is simply untrue, as discussed above.

[16] Connie also argues that the ALJ "failed to explain what statements by [Connie] undercut her subjective evidence of pain intensity as limiting her functional capacity." Pl.'s Br. at 23, Dkt. 16. However, the ALJ discussed the record as a whole and specifically pointed to records and activities of daily living that undermined Connie's subjective allegations.

medical evidence and did not discount Connie's subjective complaints simply because of lack of objective medical evidence. As discussed above, the ALJ considered Connie's testimony, her function report, her interactions with her treating physicians, her activities of daily living, and the treatment prescribed by her treating physicians. Contrary to Connie's argument, the ALJ did not improperly discount her subjective complaints but instead evaluated them in light of the objective medical evidence and her activities of daily living.[17]

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and her ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Connie's subjective complaints with substantial evidence, and that Connie is capable of performing work at the level stated in the ALJ's opinion.

## **CONCLUSION**

For the foregoing reasons, an order will be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the Commissioner, **DENYING** Connie's motion for summary judgment and **DISMISSING** this case from the Court's docket.

---

[17] Connie argues that the ALJ "failed to properly consider the opinion evidence from Drs. Gardner, Rogers, and Bolaji" as outlined in her arguments about the ALJ's assessment of her mental and physical impairments. Pl.'s Br. at 24, Dkt. 16. Connie simply points the Court to her previous arguments about the opinions of Drs. Gardner, Roger, and Bolaji being improperly considered. I have discussed those opinions at length above, and I will not do so again here. The ALJ properly considered the opinions of Drs. Gardner, Rogers, and Bolaji.

Entered:  June 12, 2023

*Robert S. Ballou*

Robert S. Ballou
United States District Judge